IN THE UNITED STATED DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PINKNEY JAMES, JR. and MAXINE JAMES,        )
                                             )
            Plaintiffs,                      )
                                             )
        v.                                   )        No. 11-cv-9126
                                             )
THE VILLAGE OF WILLOWBROOK, GEORGE           )
SCHWERTFEGER, CINDY REGAN,                   )
THEODORE KOLODZIEJ, Officer, MICHAEL         )
KURINEC, Commander, OFFICER HANDZIC,         )
MARK SHELDON, Chief, SCOTT EISENBEIS,        )
Officer, OFFICER POLSLIET, KEVIN HENRY,      )
BRIAN DELCARLO, JOHN O'MALLEY,               )
JOSEPH JOHANNAS                              )
                                             )
            Defendants.                      )

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

Plaintiffs Pinkney James, Jr. and Maxine James allege under 42 U.S.C. §§ 1982, 1983,

1985(3), and 1986 that they are victims of various violations of their constitutional and statutory

rights because of racial discrimination by the Village of Willowbrook, Willowbrook police

officers Theodore Kolodziej, Michael Kurinec, Officer Handzic, Mark Sheldon, Scott Eisenbeis,

and Officer Polsliet (the "Officers"), and various Willowbrook residents including George

Schwertfeger, Cindy Regan, Brian DelCarlo, John O'Malley, and Joseph Johannas, and Kevin

Henry (the "Neighbors"). The Jameses allege that the Officers are liable under § 1983 for

excessive force (Count I) and false arrest (Count II), that all defendants are liable under

§ 1985(3) for conspiracy to deprive them of their civil rights (Count III), that the Officers are

liable for failing to prevent the conspiracy under § 1986 (Count IV), that the Village and the

Officers are liable for depriving the Jameses of their right to equal protection under § 1983

(Count V), that all defendants are liable for depriving the Jameses of their property rights on the

basis of race under § 1982 (Count VI), and that the Village is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) (Count VII) and 745 ILCS 10/9-102 (Count VIII).

Pending before the court are three motions to dismiss. First, Schwertfeger and Regan move to dismiss Counts III and VI against them. (Dkt. No. 29.) In a separate motion, DelCarlo, O'Malley, Johannas, and Henry move to dismiss Counts III and VI against them. (Dkt. No. 30.) Finally, the Officers and the Village move to dismiss Counts III, IV, and VI against them. (Dkt. No. 35.) For the reasons explained below, those motions are all denied.

BACKGROUND

The following facts are drawn from Pinkney and Maxine James's Second Amended Complaint. (Dkt. No. 24 ("Second Am. Compl.").) The Jameses are both African Americans who moved to Willowbrook, Illinois, a predominantly white suburb of Chicago, in 2002. (*Id.* ¶¶ 20, 66.) The Jameses allege that the Neighbors and Officers discriminated against them on the basis of their race beginning shortly after their move and continuing until September of 2011. (*Id.* ¶¶ 21-49.) According to the Jameses, that discrimination forced them to put their home on the market. (*Id.* ¶ 47.)

The Jameses allege a variety of incidents to support their claims. To facilitate the discussion of the defendants' motions to dismiss, the court has grouped them based on whether they occurred during the limitations period and whether they involved the Officers or the Neighbors.

I. **Incidents Before December 22, 2009 (Outside Limitations Period)**

A. **Incidents Involving the Officers**

In March of 2003, the Jameses found animal blood thrown all over their driveway and near their doorway. Although the blood was smeared and there was no animal corpse in the

vicinity, the unidentified police officer who responded to their call suggested it was an accidental death and did not investigate further. (*Id*. ¶ 21.)

The Jameses sought police aid seventeen more times between March 2003 and December 2009. In each of those instances, the responding Officers never acted to resolve their problems as requested. Specifically, the Officers refused to investigate, report, or take a complaint from the Jameses six times in fall 2004, fall 2006, February 2007, spring 2007, September 2008, and July 2009. (*See id*. ¶¶ 24, 29, 31-33, 37.) For example, on September 8, 2008, a white male tried to enter the James home and refused to leave. (*Id*. ¶ 33.) Pinkney waived down Officer Eisenbeis' police car for help. (*Id*.) Eisenbeis responded "your house, your problem. Get off your ass" and did nothing. (*Id*.) When Pinkney persisted stating "you are the ones that are supposed to do something," Eisenbeis yelled back "Fuck You!" (*Id*.) The Jameses explained the event at the police station but Deputy Sheldon[1] said "I got a black friend, so I know how black people are" and would not investigate, prosecute, or report the complaint. (*Id*.) In another incident in July 2009, unidentified officers did nothing when the Jameses asked to file charges against Cindy Regan for driving onto their property and shouting threats. (*Id*. ¶ 37.) On other occasions the Officers refused to investigate complaints that the Jameses were receiving hate mail, that unidentified people were trespassing on their property, and that someone was trying to break in. (*Id*. ¶¶ 24, 29, 31-32.)

Three other times the police told the Jameses they would investigate, but did nothing. (*Id*. ¶¶ 22, 36, 41.) The first time, an unidentified officer promised to investigate a "strange man" staring through Pinkney's bedroom window in the summer of 2003, but did not report any results to the Jameses. (*Id*. ¶ 22.) Several years later, in March 2009, an unknown officer promised an

---

[1] At the time of the events in the complaint, Mark Sheldon's rank was Deputy. He has since been promoted to Chief. For purposes of this opinion, the court will refer to him as Deputy Sheldon.

investigation after a hate letter threatened the Jameses, using a racial slur and telling them to sell their home and "go back to the ghetto." (*Id.* ¶ 36.) In the fall of 2009, a man attempted to strike Maxine in a small black SUV. (*Id.* ¶ 41.) The Jameses provided the license plate number of the vehicle and Deputy Sheldon stated that he would investigate, but Deputy Sheldon failed to let the Jameses file a complaint or to follow-up on the investigation. (*Id.*)

Once in the spring of 2006, unidentified officers failed to stop unidentified neighbors who were shouting at the Jameses. (*Id.* ¶ 25.) Also in the spring of 2006, Officers Handzic and Eisenbeis actually joined unidentified neighbors in shouting at the Jameses that their music was too loud and that they needed to move. (*Id.* ¶ 26.) Specifically, Officer Handzic stated that the neighbors want to keep it "nice" and "don't want you people ruining that." (*Id.*) Officer Eisenbeis called the Jameses "gang bangers who hadn't been caught yet" and suggested that the logo on Maxine's sunglasses represented a Chicago street gang. (*Id.*)

During the summer of 2006, Officer Eisenbeis circled the James home daily and accelerated to hit James family members, almost hitting Maxine once. (*Id.* ¶ 27.)

On two other occasions in 2009, unidentified officers caused harm to the Jameses by making their visitors feel uncomfortable and unwelcome in Willowbrook. (*Id.* ¶¶ 34, 35.) First, an unidentified Willowbrook police officer encountered the Jameses' visitor at a grocery store table with a slice of pizza and told him "he better not be there when he drove back by," scaring the friend and deterring him from visiting again. (*Id.* ¶ 34.) Later, two unidentified officers came to the James home and asked Pinkney's girlfriend to show identification, stating that they "did not want a 'bad element' in the community." (*Id.* ¶ 35.) As a result, Pinkney felt he could not have visitors without risking harassment. (*Id.*)

Officers also acted to protect and defend the behavior of three different offenders about whom the Jameses complained. (*Id*. ¶¶ 38-40.) In July 2009, Officer Polsliet responded to the Jameses' call about a white male who entered their property without permission, tried to enter their car, and refused to leave the property. (*Id*. ¶ 38.) Polsliet talked to the offender, but did not arrest him and instead shook his hand. (*Id*.) Also in July 2009, George Schwertfeger recorded the Jameses in their living room and threatened them. (*Id*. ¶ 39.) The Jameses called the police, but Deputy Sheldon responded that Schwertfeger had a right to record them. (*Id*.) Finally, in July 2009 Maxine called the Willowbrook police after a man attacked her. (*Id*. ¶ 40.) The responding officer laughed and threatened to arrest Pinkney, who had defended Maxine, but did not arrest the attacker. (*Id*.)

## B. Incidents Involving Neighbors and Unknown Individuals

The Jameses allege that the Neighbors are responsible for a variety of harassing acts against them, although they do not identify who is responsible for many of the acts their complaint describes. For example, the animal blood the Jameses found in March 2003 came from an unknown source. (*Id*. ¶ 21.) Similarly, the Jameses do not identify the strange man staring through their window in summer 2003 (*id*. ¶ 22), the person who shot pellets at the Jameses' property in spring 2004 (*id*. ¶ 23.), the source of the various hate letters they received (*id*. ¶ 24), the neighbors who shouted racial taunts at them in spring 2006 (although they included "some of the defendants") (*id*. ¶¶ 25, 26), the person who burglarized their home in spring 2007 (*id*. ¶ 31), the trespassers who attempted to enter their house and car (*id*. ¶¶ 33, 38), or the men who attacked Maxine and tried to hit her with a car in the summer and fall of 2009 (*id*. ¶¶ 40-41.)

They do allege, however, that by 2006, George Schwertfeger, Brian DelCarlo, John O'Malley, Joseph Johannas, and Kevin Henry regularly trespassed on the Jameses' property without permission and shouted racial slurs at them. (*Id*. ¶ 28.) In spring 2007, the same group of Neighbors routinely left dog waste on the Jameses' lawn and ordered their dogs to attack the Jameses if they protested. (*Id*. ¶ 30.) They also specify that "a friend of the JOHANNAS family" entered the Jameses' property without permission in February 2007 and said "the neighbors said you people don't belong here!" (*Id*. ¶ 32.) When the Jameses told her to leave, she yelled "I have no respect for you!" (*Id*.)

In addition, they allege that in July 2009, Cindy Regan drove onto the Jameses' property and shouted threats about them continuing to live in the neighborhood. (*Id.* ¶ 37.) Also in July 2009, George Schwertfeger recorded the Jameses in their living room, made threats about them refusing to move out, and admitted to sending a hate letter to the Jameses in March 2009. (*Id*. ¶ 39.)

## II.    Incidents After December 22, 2009 (Within Limitations Period)

### A.    Incidents Involving the Officers

Between December 22, 2009, and September 2011, the Jameses allege five incidents of misconduct by the Officers. First, on December 22, 2009, Commander Michael Kurinec with other Officers entered the James property without a warrant and handcuffed Pinkney and Maxine, allegedly without probable cause. (*Id*. ¶ 42.) The Jameses allege that although they did not resist or commit a crime, Kurinec, Handzic, and Kolodziej used excessive force to drag them down the driveway, beat them, shove them, handcuff them violently, and cause them injuries. (*Id*. ¶¶ 42, 51-53.)

Second, in March 2011, unidentified officers discouraged the Jameses from filing a

complaint against Schwertfeger, who had directed racial slurs and threats at them. (*Id.* ¶ 44.) Also in March 2011, the "police department" did not aid Pinkney or Maxine as complaining witnesses in a criminal proceeding against Schwertfeger when he threatened them with retaliation if they showed up in court. (*Id.* ¶ 45.)

In June 2011, Deputy Sheldon did nothing to help the Jameses when they reported and provided video proof that DelCarlo and his brother threatened them for not leaving the neighborhood. (*Id.* ¶ 46.) A few months later, in September 2011, unidentified officers refused to allow a complaint by the Jameses that Cindy Regan had filed a false police report against them despite the fact that the Jameses showed the police a videotape supporting their view of their altercation with Regan. (*Id.* ¶ 48.)

### B.    Incidents Involving Neighbors and Unknown Individuals

In February 2011, Schwertfeger authored an internet posting about Maxine on the neighborhood website "Topix" website, stating:

> Maxine usually carries a snub nosed 38 special with hollowed point bullets in her crotch or black fanny pack around her hip. She has pulled out her gun and flashed it on numerous occasions on and off her property. Hopefully the neighborhood will stop making reports and start filing complaints.

(*Id.* ¶ 43.) An anonymous neighbor known as "the Punisher" responded that:

> We must by any means possible remove these people from our community. Run them out, burn them out tree monkeys are zoo creatures whom are usually found hanging from trees we must band together and stay informed. I have read all the posted comments to your statement I say let's do away with all those people and take America back rid our country of blacks. I hate them now comes the heat. Thanks for the heads up let's give them hell. Take our country back and rid the community of the coons!

(*Id.*) The next month, in March 2011, Schwertfeger yelled racial slurs at the Jameses and made threats aimed at getting them to move. (*Id.* ¶ 44.) As mentioned above, the Jameses filed a complaint and brought criminal charges against Schwertfeger despite police attempts to

discourage them from doing so. (*Id.*) The same month, Schwertfeger approached the Jameses and threatened them not to appear in court "or else!" (*Id.* ¶ 45.)

A few months later, in June 2011, DelCarlo and his brother approached the Jameses and threatened them to try to force them to leave the neighborhood. (*Id.* ¶46.) On July 18, 2011, Schwertfeger approached and threatened the Jameses once again, videotaping them against their will and saying "you fucking people had me arrested, that house better sell SOONER THAN LATER OR THERE WILL BE LOTS OF TROUBLE FOR YOU ALL!!!" (*Id.* ¶ 47.) The court convicted Schwertfeger of the criminal charges, but he violated a court order to stay away from the Jameses. (*Id.*) Finally, in September 2011, Cindy Regan filed an allegedly false police report, asserting that the Jameses assaulted her "put[ting] her in fear for her life by displaying gang signs." (*Id.* ¶ 48.)

## III.    Other Events

The Second Amended Complaint also alleges that, "[s]ince 2002, various Village of Willowbrook Police officers and Offending Neighbors have met at GEORGE SCHWERTFEGER's residence during evening hours." (*Id.* ¶ 49.) According to the complaint, "Offending Neighbors Mr. DELCARLO, and Mr. JOHANNAS indicated that these meetings were to 'deal with the unwanted James family being in the neighborhood.'" (*Id.*)

## LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While "detailed factual allegations" are not required, "labels

and conclusions, and a formulaic recitation of the elements of a cause of action will not do."
*Twombly,* 550 U.S. at 555. The complaint must "include sufficient facts 'to state a claim for relief that is plausible on its face.'" *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 903 (7th Cir. 2011) (quoting *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In ruling on a Rule 12(b)(6) motion, the court "construe[s] the . . . [c]omplaint in the light most favorable to Plaintiff, accepting as true all well-pleaded facts and drawing all possible inferences in his favor." *Cole*, 634 F.3d at 903.

## ANALYSIS

The defendants move to dismiss Counts III and VI of the Second Amended Complaint, and the Officers and Village also move to dismiss Count IV. The court will address each Count in turn.[2]

## I.     Count III (Conspiracy under § 1983 and § 1985)

The caption of Count III asserts that it is bringing a claim under §§ 1983 and 1985 against the Officers, the Neighbors, and the Village of Willowbrook. Of course, the Neighbors cannot be liable under § 1983 because they are not acting under color of state law. *Hernandez v. City of Goshen, IN*, 324 F.3d 535, 537 (7th Cir. 2003) (§ 1983 claim requires plaintiff to plead "(1) a deprivation of a right secured by the constitution or laws of the United States (2) caused by an action taken under color of state law" (citation omitted)). The court will therefore construe

---

[2] George Schwertfeger and Cindy Regan also assert violations of Rule 10(b) as a reason to dismiss the Counts against them. (Dkt. No. 29, at 7-8.) They contend that the Jameses failed to specify which claims are brought by which plaintiff against which defendant based on which factual allegations. The court finds that the Second Amended Complaint is sufficiently clear as outlined in the opinion to put the defendants on notice of the claims against them, and therefore denies the motion to dismiss the Jameses' Second Amended Complaint on this ground.

Count III to state only a claim under § 1985 against the Neighbors. Also, to the extent that Count III alleges a § 1983 claim against the Officers and the Village, it is redundant with Count V, which the Officers and the Village have not challenged.

The court will thus consider Count III to allege only a conspiracy claim under § 1985(3), which creates liability for any person who conspires because of racial animus to deprive another of equal protection of the law. *See Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008); *Redwood v. Dobson*, 476 F.3d 462, 466 (7th Cir. 2007). Here, the complaint alleges the defendants are liable under § 1985(3) because they conspired to deprive the Jameses of their right to equal police protection. (Second Am. Compl. ¶ 60.) The complaint alleges the conspiracy began in early 2002 and continued through the time of filing the lawsuit. (*Id.*)

Before analyzing the sufficiency of that claim, however, the court must address the applicability of the statute of limitations.

A.     Statute of Limitations

Courts uniformly apply state limitations statutes to federal civil rights actions other than those arising under § 1986. *Baker v. F & F Inv.,* 420 F.2d 1191, 1193 (7th Cir. 1970). Claims brought under § 1985 are subject to Illinois's two-year statute of limitations for personal injury torts. *See Ross v. Illinois*, 48 F. App'x 200, 202 (7th Cir. 2002); *see also Farrell v. McDonough*, 966 F.2d 279, 281 (7th Cir. 1992). The defendants move to strike allegations referring to incidents occurring between early 2002 and December 22, 2009, because they violate the two-year statute of limitations. In response, the Jameses assert that the continuing violation doctrine overcomes the statute of limitations defense in this case.

The continuing violation doctrine "allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period." *Garrison v. Burke*, 165 F.3d 565, 569

(7th Cir. 1999) (citation and quotation marks omitted). Under the continuing violation doctrine, separate violations can be linked and treated as one continuing violation if it would be unreasonable to require the plaintiff to sue on each incident separately. *Selan v. Kiley*, 969 F.2d 560, 565 (7th Cir. 1992).

The continuing violation doctrine commonly applies to allegations of harassment, because "offensive words or actions may be too trivial to count as actionable harassment, but if they continue they may eventually reach that level and then the entire series is actionable." *Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).[3] The Seventh Circuit has placed limits on the use of the continuing violation doctrine in the context of harassment claims, however, stating that:

> [a]cts that fall outside the statute of limitations may be joined to an act within the statute only if a reasonable person in the position of the plaintiff would not have known, at the time the untimely acts occurred, that she had a claim; rather, she could *only tell by hindsight* that the untimely acts represented the early stages of harassment.

*Garrison*, 165 F.3d at 569-70. Moreover, for the continuing violation doctrine to apply, "the various acts must be reasonably close to each other, in time and circumstances." *Id.* at 570.

To apply the continuing violation doctrine here, the court must determine at what point the Jameses should have become aware that they had a § 1985(3) claim. The Jameses certainly were on notice of various racially hostile acts against them by both the Officers and the Neighbors prior to December 22, 2009. Section 1985, however requires the existence of a conspiracy. *See Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 642 (7th Cir. 2006). The court must therefore determine at what point the Jameses were put on notice that the hostile acts

---

[3] *Limestone* involved sexual harassment. Racial harassment is similar in nature, however, because it is not necessarily more concrete or readily discernible than sexual harassment. The two should be treated similarly for statute of limitations purposes.

against them were part of a conspiracy, and were not merely unconnected activity by independent actors.

The existence of a conspiracy, of course, requires "an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007). In this case, the alleged conspiracy is an agreement between the Neighbors and the Officers to deprive the Jameses' of their "constitutionally protected rights to be free of discriminatory practices and equal protection of the laws, through a pattern of police misconduct." (Second Am. Compl. ¶ 60.) The Jameses could not have been aware of such a conspiracy until they had sufficient information to suspect that the Neighbors' harassment was occurring in concert with the actions of the Officers who were refusing to prevent that harassment. The question before the court is therefore at what moment such an agreement became apparent.

Throughout the pre-December 22, 2009 period, the Jameses allege that the Officers repeatedly refused to respond to their complaints of racial harassment against various neighbors. Prior to that date, however, the Officers' behavior appeared just as likely to be the result of their own, independent animus, rather than part of concerted actions with the Neighbors. For example, most of the complaints to which the Officers failed to respond before December 22, 2009, involved unknown individuals, or only single Neighbors involved in isolated acts. There is thus no particular reason the Jameses should have assumed that the events were connected, or that the Officers were somehow coordinating their response with each of the harassing Neighbors. It is only after December 22, 2009, that the Officers began to respond inadequately multiple times to racial harassment by the same individuals. For example, Regan was first involved when the Officers failed to investigate her threats against the Jameses in July 2009. (*Id.* ¶ 37.) Then, the

Officers again refused to allow the Jameses to discredit Regan's allegedly false police report against them in September 2011. (*Id.* ¶ 48.) Similarly, in July 2009 the Officers failed to respond to Schwertfeger's attempt to record the Jameses in their home. (*Id.* ¶ 39.) Then, in March 2011, the police again discouraged the Jameses from filing a complaint because of Schwertfeger's threats. (*Id.* ¶ 44.) It is only after the Officers failed to investigate repeated inappropriate conduct by the same perpetrators that the Jameses could begin to suspect that the Officers' actions were coordinated with the harassing Neighbors.

Second, the quality of the Officers' involvement changes markedly after December 22, 2009. Prior to that date, the allegations against the Officers involved mostly failures to respond to a variety of complaints,[4] suggesting a passive role. Beginning with the incident on December 22, 2009, when the Officers allegedly arrested the Jameses violently with no provocation (*id.* ¶¶ 42, 51), the Officers themselves begin to take significant active steps to harass the Jameses. That affirmative behavior is the first suggestion that the Officers were actively hostile to the Jameses, and makes a conspiracy between the Officers and the Neighbors considerably more plausible.

Next, the Jameses' allegation that the Officers and Neighbors (except Regan) met at the Schwertfeger's home at various times since 2002 to plan how to "deal with the unwanted James family being in the neighborhood" (*id.* ¶ 49) does not indicate when the Jameses became aware of those meetings. Viewing the complaint in the light most favorable to the Jameses, however, the court will assume that they did not become aware of those meetings until after December 22, 2009. The Jameses thus had no reason to believe prior to that date that a conspiracy between the

---

[4] The incident in the spring of 2006 when Officers Handzic and Eisenbeis joined the neighbors in shouting at the Jameses is not to the contrary. (*See* Second Am. Compl. ¶ 26.) The officers there were still reacting to the neighbors' initial actions of harassing the Jameses, and did not initiate any harassing behavior themselves. The only incident of somewhat more active behavior by the Officers prior to December 22, 2009, is Officer Eisenbeis driving his squad car around the Jameses' home in a threatening manner. (*Id.* ¶ 27.)

Officers and the Neighbors existed, so the continuing violation doctrine can apply.

Application of the continuing violation doctrine here is also not barred by the requirement that "the various acts must be reasonably close to each other, in time and circumstances." *Garrison*, 165 F.3d at 570. Often, a significant gap of time between acts can preclude the operation of the continuing violation doctrine. *See id.* (incidents of harassment did not reinforce each other because of two-year gap); *Selan*, 969 F.2d at 567 (two-year gap between acts indicated they were not continuous or connected); *see also Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 377 (6th Cir. 2002) (eight months between acts demonstrated they were not continuous). Although there are some extended gaps in the events here, the consistent behavior of the defendants over an extended period of time, and its furtherance of the defendants' repeatedly stated goal of forcing the Jameses to move out of the neighborhood, suggest that all of the events are connected. The defendants' hostility to the Jameses may have ebbed and flowed, occasionally flaring up into actual conflict and at other times merely simmering in the background, but that does not obscure that the plaintiffs have alleged an ongoing, persistent, and pervasive hostility to their presence in Willowbrook because they are African American that underlies and unites all of the events in their complaint. Accordingly, the continuing violation doctrine applies, and none of the Jameses allegations are time-barred insofar as they support the Jameses' § 1985(3) claim.

### B. Merits of the § 1985(3) Conspiracy Claim

The elements of a conspiracy claim under § 1985 are "(1) a conspiracy; (2) a purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to his person or property or a deprivation of any right or privilege

of a citizen of the United States." *Keri*, 458 F.3d at 642 (citation omitted). The court will consider whether the Jameses adequately pleaded each element.

### 1. Existence of a Conspiracy

A conspiracy is "an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means." *Borsellino*, 477 F.3d at 509. Under *Twombly* and *Iqbal*, the Jameses must allege enough facts to make the existence of a conspiracy plausible. *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009). Even before *Twombly* and *Iqbal*, and continuing after those cases, allegations of a conspiracy are "held to a higher standard than other allegations; mere suspicion that persons adverse to the plaintiff had joined a conspiracy against him or her [is] not enough." *Id.* Instead, the plaintiff must make specific factual allegations that tie the defendants together in a conspiracy. *Id.*

The Seventh Circuit recently applied that standard to a situation sharing some elements with the Jameses' complaint. In *Geinosky v. City of Chicago*, the plaintiff alleged that he was the victim of a conspiracy by a unit of the Chicago Police Department to deprive him of his right to equal police protection. 675 F.3d 743, 745 (7th Cir. 2012). According to the complaint, the plaintiff had received twenty-four unjustified parking tickets from members of the same police unit over a fourteen-month period. *Id.* The complaint included no explicit allegation that the officers had agreed to discriminate against the plaintiff. *Id.* at 749. Nonetheless, the court held that "[i]f several members of the same police unit allegedly acted in the same inexplicable way against a plaintiff on many different occasions, we will not dismiss a complaint for failure to recite language explicitly linking these factual details to their obvious suggestion of collusion." *Id.*

Applying the reasoning of *Geinosky*, the allegations here are sufficient to suggest a

plausible conspiracy. The Jameses make repeated allegations of discriminatory conduct by members of the same small police department.[5] Those Officers would have had repeated contact with each other, so it is plausible to believe that they had the opportunity to conspire together and that their common harassment of the Jameses was the result of collusion. To be sure, unlike in *Geinosky*, the Jameses allege that the conspiracy extended beyond a small group of police officers to include various residents of Willowbrook. There are several factors, however, that the court, through the application of "its judicial experience and common sense," *Iqbal*, 556 U.S. at 679, determines make a conspiracy with the Neighbors plausible. First, Willowbrook is a small town,[6] so it is plausible to believe that the Neighbors and the Officers had regular contact and thus the opportunity to conspire together. Second, the alleged harassment often involved action that, rather than merely being parallel, appears to be coordinated. For example, the Jameses allege that the Officers frequently enabled the Neighbors' harassment by refusing to respond to the Jameses' requests for help and even joining in the harassment with the Neighbors through their hostile comments.

Finally, the Jameses' Second Amended Complaint includes an explicit allegation of collusion when it states that, since 2002, the Officers and Neighbors (except Regan) met at Schwertfeger's home in the evening to discuss how to "deal with the unwanted James family being in the neighborhood." (Second Am. Compl. ¶ 49.) The defendants contend that the evening meetings fail to establish an agreement because the allegations are conclusory, fail to state the date of the meetings, and do not indicate precisely who was present. (*See* Dkt. No. 29, at 12

---

[5] The court takes judicial notice that the Willowbrook police department currently has twenty full-time police officers, and was likely about the same size at the time of the events alleged in the complaint. *See* http://www.willowbrookil.org/index.aspx?NID=155 (last visited July 16, 2012).

[6] The court takes judicial notice that the Village of Willowbrook currently has 8,967 residents, and was likely about the same size at the time of the events alleged in the complaint. *See* http://www.willowbrookil.org/DocumentView.aspx?DID=33 (last visited July 16, 2012).

(citing *Sims v. Cnty. of Bureau*, 506 F.3d 509, 517 (7th Cir. 2007)).) Nonetheless, in light of the other circumstantial evidence supporting the existence of a conspiracy, the court does not find that defect fatal. *See Quinones v. Szorc*, 771 F.2d 289, 291 (7th Cir. 1985) (holding that the plaintiff sufficiently alleged an agreement without specifying the time or place of the agreement because "[t]he very nature of a conspiracy obscures most, if not all, information about the alleged conspirators' agreement," and "circumstantial evidence of the conspiracy . . . is all that is ordinarily obtainable before discovery and trial"). The allegation about the evening meetings provides a plausible occasion for the formation and coordination of the conspiracy, and it thus contributes to the plausibility of the conspiracy.[7]

### 2. Purpose of Depriving the Plaintiffs of Equal Protection of the Laws

The Jameses explicitly allege that the defendants acted with the purpose of depriving them of their right of equal protection of the law. (Second Am. Compl. ¶ 60.) That allegation is supported by the allegations that various defendants repeatedly stated that they wished to force the Jameses to move out of the neighborhood. (*Id.* ¶¶ 36, 37, 39, 43, 44.) Therefore, the plaintiffs have adequately pleaded that violation of a constitutional right was a goal of the alleged conspiracy.

### 3. Act in Furtherance of the Conspiracy

The Jameses allege numerous acts of harassment against them that are sufficient to constitute acts in furtherance of the conspiracy. This element is plainly present.

---

[7] Regan contends that the allegations of her participation in the conspiracy are insufficient because she was not alleged to have participated in the evening meetings at Schwertfeger's home. (Second Am. Compl. ¶¶ 28, 49.) The Jameses do allege, however, that she engaged in harassment against them to which the police turned a blind eye by driving onto their property, shouting threats at them, and filing a false police report against them. (*Id.* ¶¶ 37, 48.) In light of the allegations against Regan of harassment that was apparently coordinated with the Officers and similar to the harassment by other Neighbors during the same time period, and the general plausibility of the conspiracy, the court finds it plausible that Regan was part of the conspiracy, even if she did not participate in the evening meetings.

### 4. Plaintiffs Deprived of Constitutional Right to Equal Protection of the Laws and to Freedom from Discriminatory Treatment

The Jameses allege that the conspiracy violated their right to equal protection by disparately providing them inadequate police protection. The defendants contend that the Jameses have failed to allege a deprivation of a constitutional right, because the constitution does not require a state to provide "even so elementary a service as maintaining law and order." (Dkt. No. 31, at 10 (quoting *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982)).) The defendants overlook, however, that although the state need not provide such services, if it does provide them, then "discrimination in providing protection against private violence could of course violate the equal protection clause." *Bowers*, 686 F.2d at 618. Consistent with that principle, the Seventh Circuit has stated that "selective withdrawal of police protection, as when the Southern states during the Reconstruction era refused to give police protection to their black citizens, is the prototypical denial of equal protection." *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000). Accordingly, the Jameses have adequately alleged the denial of their constitutional right to equal protection.

The defendants contend that the Jameses failed to allege facts showing that the conspiracy denied them equal protection because they did not allege facts showing that the Officers treated anyone else differently. (Dkt. No. 31, at 10.) Imposing such a requirement at the pleading stage is inappropriate, however. As the court stated in *Geinosky*:

> [I]n a straightforward official harassment case like the allegations here, forcing the plaintiff to name a person not so severely harassed serves no such purpose (and in any event certainly is not necessary in the complaint itself). Are there people in Chicago who have not received more than a dozen bogus parking tickets from the same police unit in a short time? Geinosky could find hundreds of those people on any page of the Chicago phone book.

*Geinosky*, 675 F.3d at 746. Similarly, it would serve no purpose to require the Jameses to

identify white individuals in Willowbrook who have not faced inadequate police protection from harassment on the basis of race. Accordingly, the Jameses have adequately stated that they were denied their right to equal protection. They have stated a claim under § 1985(3), so the defendants' motion to dismiss Count III is denied.

## II.     Count IV (Failure to Prevent Conspiracy under § 1986)

Count IV alleges that the Officers are liable under § 1986 for failing to prevent a conspiracy aimed at depriving the Jameses' of their federally protected rights. The Officers contend that the court should dismiss Count IV because a valid claim under § 1985 is a necessary prerequisite to a § 1986 claim. Because the court has held that the Jameses have pleaded a valid claim under § 1985(3), the motion to dismiss Count IV is denied.

## III.     Count VI (Deprivation of Property Rights under § 1982)

Count VI alleges that all defendants are liable under § 1982 for conspiring to force the Jameses from their home because they are African American. Section 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. The Supreme Court has stated that § 1982 protects "the right of black persons to hold and acquire property on an equal basis with white persons and the right of blacks not to have property interests impaired because of their race." *City of Memphis v. Greene*, 451 U.S. 100, 122 (1981). Although the Seventh Circuit has not directly addressed the question, it has suggested that § 1982's protection of a citizen's right to "hold" property includes a prohibition on racial discrimination in the provision of services or facilities to property owners. *See Bloch v. Frischholz*, 587 F.3d 771, 772, 775 n.5 (7th Cir. 2009) (en banc) (noting that the parties did not contest the underpinnings of the § 1982 claim, but holding that plaintiffs could

proceed with claim that their condominium association discriminated in the provision of privileges and services); *see also Concerned Tenants Ass'n of Indian Trails Apartments v. Indian Trails Apartments*, 496 F. Supp. 522, 527 (N.D. Ill. 1980) (denying motion to dismiss § 1982 claim against landlord who provided worse services when racial composition of his apartment building was predominantly black).

Also, several judges in this district have held that harassing acts directed at property owners with the goal of intimidating them in the use or occupancy of their property can run afoul of § 1982's protection of the right to "hold" property. *See Whisby-Myers v. Kiekenapp*, 293 F. Supp. 2d 845, 849 (N.D. Ill. 2003) (Kennelly, J.) (§ 1982 claim asserted against neighbor who detonated flash simulator and shouted racial epithets at black homeowner is valid because "[w]e agree with those courts that have concluded that section 1982's protection of the right 'to hold' property includes the right to use one's property"); *Johnson v. Smith*, 810 F. Supp. 235, 237-38 (N.D. Ill. 1992) (Shadur, J.) (burning cross on lawn and breaking windows in home are sufficient to overcome motion to dismiss § 1982 claim); *Stirgus v. Benoit*, 720 F. Supp. 119, 122 (N.D. Ill. 1989) (Bua, J.) ("When a racially-motivated firebombing destroys a person's home, that person does not truly enjoy the same freedom to acquire and 'hold' property as a similarly situated white citizen."). The court agrees with those cases that allegations of harassment of a homeowner with the intent to deprive him of the right to use his property because of race are sufficient to state a claim under § 1982. The legal theory behind the plaintiffs' claims is thus sound.

Moreover, the conspiracy between the Neighbors and the Officers to force the Jameses to move out of their home and to deny them equal access to police protection provides a sufficient factual predicate to state a claim under those legal principles. Various defendants contend that

the particular allegations against them are insufficient to state a claim under § 1982. The court need not parse the particular allegations against each defendant, however, because the court has already determined that the Jameses have alleged a valid conspiracy against all defendants. Each defendant is therefore responsible for the foreseeable activities of his co-conspirators to further the goals of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640 (1946); *see also Moses v. Ill. Dep't of Corr.*, 908 F.2d 975 (7th Cir. 1990) (unpublished) (applying *Pinkerton* in a § 1985 case).

Some of the defendants also contend that the harassment alleged in the complaint is less violent than that in the cases listed above. The complaint alleges a significant amount of violence against the Jameses, however, including the false arrest and excessive force by the Officers in December 2009 (Second Am. Compl. ¶ 42), attacks by the defendants' dogs (*id.* ¶ 30), attempted burglaries (*id.* ¶¶ 31, 38), an attack on Maxine (*id.* ¶ 40)[8] and numerous threats against the Jameses. Although police brutality, threats, and dog attacks may not be as serious as cross-burning or firebombing, the court is not willing to determine at the motion to dismiss stage that the defendants' actions were mild enough to avoid interfering with the Jameses' use of their property. If the alleged harassment was severe and pervasive enough, it may have impaired the Jameses ability to use their property. That is particularly true here, where the defendants are also alleged to have conspired to deny the Jameses' police protection, without which they would have increased fear of the harassment and threats. Viewing the allegations in the light most favorable to the Jameses, therefore, the defendants' arguments fail. The court thus denies the defendants' motion to dismiss Count VI.

---

[8] The Jameses did not allege the identity of the alleged burglars or Maxine's attacker, likely because they are unaware of their identity at this time. In light of the repeated harassment by the defendants and taking the allegations in the light most favorable to the Jameses, however, it is reasonable to assume that the burglars and the attacker are connected to the alleged conspiracy.

## CONCLUSION

For the reasons listed above, the motion to dismiss of the Officers and the Village of Willowbrook (Dkt. No. 35) is denied. The motion to dismiss of George Schwertfeger and Cindy Regan (Dkt. No. 29) is also denied. Finally, the motion to dismiss of Brian DelCarlo, John O'Malley, Joseph Johannas, and Kevin Henry (Dkt. No. 30) is also denied. The defendants' answer is due August 3, 2012. Counsel are to confer pursuant to Rule 26(f) and jointly file a Form 52 on or before August 20, 2012. The case is set for status and entry of a scheduling order at 9:00 AM on August 23, 2012. The parties are encouraged to discuss settlement.

ENTER:

_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: July 19, 2012